UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

P.T. Medisafe Technologies,

        Plaintiff,

v.                                                          Case No. 14-cv-974 (JNE/FLN)
                                                          ORDER

Preventive Care, Inc., and
Anil Segat,

        Defendants.

This matter is a contract dispute between Plaintiff P.T. Medisafe Technologies (Medisafe) and Defendants Preventive Care, Inc. (PCI) and Anil Segat, PCI's president. It is before the Court on Medisafe's three separate motions for summary judgment on its breach of contract claims, for summary judgment on PCI's fraud counterclaim, and to exclude the testimony and opinions of PCI's damages expert. For the reasons provided below, the motion for summary judgment on Medisafe's contract claims is granted and the other motions are denied.

## BACKGROUND

Medisafe is an Indonesia-based manufacturer of medical and industrial disposable gloves. PCI is a Minnesota corporation that distributes medical supplies, including disposable gloves. In 2010 or early 2011, PCI began purchasing gloves from Medisafe. Early in the business relationship, the parties discussed whether Medisafe's gloves met a European standard applicable to examination gloves known as EN 374-3. At the time, Medisafe's gloves did not. However, on April 11, 2011, Ravi Venkat, a vice president at Medisafe, emailed Segat with documentation showing that a testing body, Leitat Technological Center, had certified that powder free nitrile examination gloves provided by Medisafe met the EN 374-3 standard.

In August 2011, Medisafe and PCI signed a glove supply agreement whereby Medisafe agreed to produce and sell to PCI powder free nitrile disposable gloves in magenta and copper and coated with Allogel. Medisafe became the exclusive supplier for PCI. PCI fell behind on its payments and, on October 4, 2012, the parties entered into the Agreement for Settlement of Overdue Amount (the Agreement). In the Agreement, the parties stipulated that, as of September 12, 2012, PCI owed Medisafe $877,258. They agreed this amount was "entirely past due" and was "verified, undisputed and unconditionally confirmed by the Parties." PCI agreed to settle the overdue amount by January 31, 2013, in accordance with a "paydown schedule" and "subject to on-time delivery of additional Product from [Medisafe]." Appendix B to the Agreement provided a schedule for both the pay down of the overdue amount and for Medisafe's future deliveries. Segat provided an unconditional personal guarantee to cover the $877,258 owed, as well as any future sums payable for transactions between the parties.

In December 2012, PCI received a shipment of defective gloves from Medisafe. PCI alerted Medisafe that most of the 1,980 cases of magenta gloves were defective. Over the next few months, Medisafe shipped replacement gloves to PCI. Another shipment containing defective gloves was sent to a PCI customer in Green Bay, Wisconsin in January 2013. This shipment contained about 4,600 cases of gloves. PCI alerted Medisafe to the problem and requested replacements. Medisafe provided some replacement gloves for this order, though PCI argues Medisafe did not replace the entire amount of defective gloves.

On April 4, 2014, Medisafe filed a complaint, alleging in relevant part that PCI and Segat breached their obligations to pay for the gloves PCI ordered and received. PCI filed counterclaims, alleging in part that Medisafe breached their agreements by failing to timely deliver gloves and by providing defective gloves. PCI also alleged that Medisafe committed

fraud when it falsely represented that its gloves met the EN 374-3 standard. On December 1, 2015, Medisafe filed the three motions before the Court.

## DISCUSSION

The Court will first discuss the motion for summary judgment as to Medisafe's contract claims. It will then discuss the motion for summary judgment as to the fraud counterclaim and conclude by addressing the motion to exclude expert testimony.

### A. Summary Judgment on Medisafe's Claims

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view facts that the parties genuinely dispute in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under Minnesota law, a "buyer must pay at the contract rate for any goods accepted." Minn. Stat. § 336.2–607(1). Medisafe seeks summary judgment against PCI and Segat in the amount of $789,979 for the gloves PCI accepted. Medisafe reaches this figure by starting with the $877,258 that the Agreement provides as "verified, undisputed and unconditionally confirmed." Medisafe then adds $722,721, which PCI offers in an interrogatory response as the

total value of the gloves shipped by Medisafe pursuant to the Agreement. From this total, Medisafe subtracts the $810,000 that PCI's interrogatory response shows as the total amount PCI has paid Medisafe.

PCI and Segat do not dispute these numbers. Instead, they offer several arguments for why they are not liable to pay for the gloves Medisafe shipped to PCI.

   *1. Conditions Precedent*

Defendants argue that Medisafe did not meet several conditions precedent that existed before the Agreement and Segat's personal guarantee were enforceable. A condition precedent "is any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract." *Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 176 (Minn. 1989). Defendants point to an October 5, 2012 email from Segat to Medisafe's CEO Anil Taneja and another Medisafe employee. Segat writes, "I need [the signed Agreement] by Monday October 8th by 9 am US CST." Defendants assert that Segat did not receive the signed agreement until sometime later. The email also states: "In order to avoid any potential 'headwinds and turbulence' please make sure from your side that: a. PCI can track the ICP air shipment on DHL's web tracking system as of October 6th, 2012 . . . [;] b. The Meltec air shipment leaves Medan latest by October 9th[;] c. We have the OBL for the container that has been shipped on 9/22 latest by 10/10." Defendants assert there is no evidence that item a occurred and the record shows that items b and c did not.

Nothing in the email's language expressly ties these events to Defendants' obligations to pay for the gloves. Nothing within the four corners of the Agreement references the facts or events raised in the email. Nothing in the record shows that Medisafe agreed to these conditions.

Accordingly, the Court finds that the events discussed in the email did not create conditions precedent to Defendants' obligations to pay for the gloves PCI accepted.

2. *Delayed Shipments*

The Agreement states that PCI "agrees to settle the Overdue Amount by 31st January, 2013 based on a defined paydown schedule . . . and subject to on-time delivery of additional Product from [Medisafe.]" Based on this language, PCI argues that it is not obligated to settle the overdue amount because Medisafe made late shipments. However, the Agreement expressly contemplates what should happen if shipments are late: "[PCI] has the right to delay subsequent payment from the Overdue Amount by the number of days a shipment is delayed from the date specified in the Paydown schedule." A delayed shipment allows PCI more time to make payments, but it does not excuse PCI's obligation to pay for the gloves.

At the hearing, PCI's counsel further argued that it is Medisafe's turn to make a shipment under the Agreement's schedule and, until it does, PCI need not make another payment toward the overdue amount. This argument misunderstands PCI's obligation, which exists independent of the Agreement. It is undisputed that, before entering the Agreement, PCI ordered, accepted, and did not pay for gloves worth $877,258. The statutory rule is that PCI must pay the contract rate for these accepted goods. The Agreement schedules PCI's settlement of this overdue amount and structures the parties' ongoing business relationship. But it does not absolve PCI of its obligation to pay for the goods it had already accepted.

3. *Modifications to the Agreement*

Defendants also argue that Medisafe's motion should fail because the Agreement was modified and Medisafe has not shown that the modified terms were executed. As evidence of modifications, Defendants cite to two emails. The first is a January 3, 2013 email from Segat to

5

Medisafe that lists proposed shipping dates and corresponding payments. The second is a January 28, 2013 email from Taneja to Segat. The email discusses an "action plan" and concludes: "Subsequent shipments will be decided upon the above being executed by both." Neither email contains language that could be construed as changing PCI's basic obligation to pay for the gloves it had accepted and would later accept.

   4. *Miscellaneous Contract Provisions*

Defendants also argue that Medisafe has failed to show that it met the following conditions in the Agreement: that PCI's account become further delinquent before Medisafe stops shipment; that Medisafe's sales are in accordance with purchase orders; and that Medisafe provide originals and copies of the bill of lading, invoice, and packing list at certain times. Even if Medisafe failed to meet these conditions, nothing in the language of the Agreement shows that such failures excuse Defendants' obligations to pay for gloves PCI accepted.

   5. *Nonconforming Gloves*

Defendants assert that Medisafe provided several shipments of gloves that were defective or nonconforming because they could not be donned and were not compliant with EN 374-3. The issue is whether PCI accepted these gloves or made effective rejections, in which case PCI need not pay for them. Acceptance of goods occurs when the buyer: "(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the buyer will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership." Minn. Stat. § 336.2-606(1). "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Minn. Stat. § 336.2-602(1).

PCI lists seven purchase orders that contained defective gloves. Five of these were inspected, discovered as defective, and rejected before they were shipped from Medisafe. Medisafe concedes that PCI does not owe payments for these shipments. Its motion only seeks payment for the gloves PCI admits were actually shipped.

PCI identifies two orders of defective gloves that were actually shipped. The first is the December 2012 shipment of 1,980 cases of magenta gloves. A January 10, 2013 email from Andreas Brown of PCI to Taneja states that "customers are having problems" with the gloves and "it is highly likely that ALL the product will be returned to us." The email concludes: "Given the severity of the problem we will need to airship at least some product to cover the interim between now & when the next AlloGel Magenta shipment arrives." Venkat of Medisafe inspected the gloves and concluded in a February 1, 2013 email to Taneja that there "exists a donning issue on the gloves," though it is "much more marginal on size XL and in my opinion no real issues on XL." Taneja estimated that 200 of the cases were for size XL, leaving 1,780 problematic cases. Evidence from invoices and shipping documents shows that Medisafe replaced 1,780 cases of magenta gloves by a combination of air freight and vessel shipments.

Medisafe correctly argues that PCI's email request for replacements was not a rejection excusing PCI's nonpayment but rather a request for a cure. *See* Minn. Stat. §§ 336.2-607(2), 2-608; *Ames Engineering Corp. v. Lighthouse Bay Foods, Inc.*, No. C6-99-372, 1999 WL 595393, at *2 (Minn. App. Aug. 10, 1999). If a seller fails to seasonably cure nonconformities, the buyer may revoke its acceptance and refuse to pay. *See* Minn. Stat. § 336.2-608. But Defendants point to no evidence that PCI revoked the acceptance or that the replacements were problematic. Indeed, when asked at deposition whether PCI sold the replacement gloves, Brown testified, "I would imagine we did."

Defendants also show that 4,600 cases of defective gloves were shipped to a PCI customer in Green Bay, Wisconsin in January 2013. A March 14, 2013 email from Brown of PCI to Taneja states that the order is "proving to be a massive problem with significant defective product." The email demands: "Medisafe needs to prepare to immediately make ready for air-ship a 20' replacement shipment in a proportionate size ratio to the original order." This communication shows that PCI alerted Medisafe to defective goods and requested a cure. It does not show that PCI rejected the gloves. PCI points to no evidence showing a rejection.

The parties dispute the number of replacement gloves Medisafe shipped for this order. PCI asserts it sent 270 replacement cases as PCI requested. Defendants assert that Medisafe sent 100 replacement cases, which was insufficient to cover the defective product. The Court need not resolve this dispute to rule on the motion. A revocation of acceptance "is not effective until the buyer notifies the seller of it." Minn. Stat. § 336.3-608(2). Defendants point to no evidence that PCI notified Medisafe of a revocation of acceptance. With no evidence that PCI notified Medisafe of a rejection and no evidence that it later sent notice of a revocation, Defendants are obligated to pay the contract price.

With respect to the allegation that Medisafe's gloves did not comply with EN 374-3, Defendants have no evidence that PCI rejected a shipment for this reason.

In short, Medisafe shipped many cases of defective or nonconforming gloves for PCI. But Defendants point to no evidence that PCI rejected these gloves, rejected their replacements, or later revoked acceptance of the goods.

   6. *Prior Breach Doctrine*

Finally, PCI argues that Medisafe's breaches excuse PCI from making payments under the "prior breach" doctrine, which holds that "the non-performance of one party under a contract

excuses the future contractual obligations of the other party." *Nutrisoya Foods, Inc. v. Sunrich LLC*, 626 F. Supp. 2d 985, 990 (D. Minn. 2009). This argument is unavailing because the common law doctrine of prior breach does not abrogate PCI's statutory obligation to pay for goods accepted. *See TC/American Monorail, Inc. v. Custom Conveyor Corp.*, 822 N.W.2d 812, 817 (Minn. App. 2012), *rev'd on other grounds*, 840 N.W.2d 414 (Minn. 2013).

The Court finds that there is no genuine dispute of material fact as to PCI's and Segat's obligations to pay Medisafe $789,979 for the gloves Medisafe shipped and PCI accepted. The Court therefore grants Medisafe's motion and finds Defendants liable for this amount.

### B. Summary Judgment on PCI's Fraud Counterclaim

PCI alleges that Medisafe committed fraud or intentional misrepresentation when it falsely represented that the gloves sold to PCI met the EN 374-3 standard. The elements of intentional misrepresentation are that the alleged wrongdoer: "(1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation." *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn. 1992).

Medisafe argues that PCI cannot show that Medisafe's representations were false, that PCI actually relied on them, and that PCI suffered resulting damages.

#### 1. False Representation

PCI did not test Medisafe's gloves to determine whether they failed to meet the EN 374-3 standard. Instead, PCI's evidence comes primarily from two emails. First, PCI cites to an April

9

25, 2013 email purportedly from an employee at an unnamed PCI customer. The email states that gloves "are tearing apart with in one minute time [of acetone exposure] as compared to specification of 480 minutes." Acetone is one of the chemicals tested for EN 374-3, and Medisafe's certification lists a breakthrough time of greater than 480 minutes for acetone exposure. Nevertheless, PCI cannot rely on this email because it is inadmissible hearsay. *See* Fed. R. Evid. 801; *Novotny v. Tripp County*, 664 F.3d 1173, 1178 (8th Cir. 2011). It is an out of court statement used to prove the truth of the matter asserted— that is, that the gloves tore and failed to meet the specifications. Segat's testimony about the communication with the customer suffers from similar hearsay problems.

PCI also relies on an email exchange between Segat and Taneja. On June 12, 2013, Segat referred in an email to "on going issues" with EN 374. Taneja replied: "As to EN 374 there is no disposable single wall nitrile glove in the world that meets the EN 374 at Level 1." PCI argues that this email is an admission that Medisafe's gloves could not meet EN 374-3, despite earlier representations to the contrary.

Medisafe argues that the email does not mention EN 374-3 but only discusses "EN 374 at Level 1," leaving open the possibility that Taneja was referring to a different EN 374 subtype. While it is conceivable that Taneja meant EN 374-2 or some other subtype, a reasonable jury could find otherwise. The record shows that EN 374-3 is ranked from Level 1 to Level 6. The record also shows that EN 374-3 was previously referenced in communications between the parties and that Medisafe sent PCI a certificate showing that its gloves met EN 374-3. PCI also points to a purchase order for product number NIT-CH-41, which, according to Medisafe's specifications sheet, refers to a glove that is or can be produced in compliance with EN 374-3. On this record, a jury could reasonably conclude that Taneja's statement about "EN 374 at Level

1" referred to EN 374-3 at Level 1. Furthermore, Medisafe's certificate appears to represent that its gloves pass EN 374-3 at Level 6, a more stringent standard than Level 1. A jury could reasonably conclude that Taneja's email contradicts this representation by admitting that Medisafe's gloves cannot even pass Level 1. Thus, a reasonable fact finder could conclude both that Medisafe represented its gloves met EN 374-3 and that this representation was false.

    *2. Actual Reliance*

Medisafe also argues that PCI did not rely on the EN 374-3 representations. Reliance is generally a question of fact. *Hoyt Properties, Inc. v. Prod. Res. Grp., L.L.C.,* 716 N.W.2d 366, 374 (Minn. App. 2006) *aff'd,* 736 N.W.2d 313 (Minn. 2007). Here, Segat testified at deposition that he was concerned about the EN 374-3 standard and asked Medisafe about it early in the parties' relationship. Medisafe informed him that "they were endeavoring to meet the requirements of the standard." Venkat of Medisafe later "mentioned that they now had the certification and the testing done." In an April 11, 2011 email, Venkat sent the supporting documentation to Segat. PCI subsequently ordered large quantities of gloves from Medisafe. PCI, according to Segat's deposition testimony, also updated its packaging and technical specifications to inform customers its gloves now met EN 374-3. This evidence is sufficient to survive summary judgment on the issue of reliance.

    *3. Damages*

PCI attests that it suffered damages when it revised packaging and specifications to show that its gloves were EN 374-3 certified. An email from Segat to PCI employee Patricia Van de Wal states that "Medisafe (Indonesia) now has full EN 374 compliance for 3 and 4 mil nitrile" and instructs Van de Wal to "please update the tech specs for EN 374 right away." In an affidavit, Van de Wal avers that she made the updates as instructed. A revised technical

specification sheet and revised box artwork are attached to the affidavit. Van de Wal states that she removed the EN 374-3 compliance items in April 2013. She estimates that adding and subtracting the compliance items took her nine days, which PCI calculates cost it $2,067.03.

Medisafe argues that the email from Segat to Van de Wal and the promotional materials attached to her affidavit were not produced in discovery, though they were available, and cannot be used to defeat summary judgment. However, even without these materials, there is sufficient evidence of damages. Segat testified at deposition that, after receiving the EN 374-3 certification from Medisafe, PCI informed customers, through its packaging and technical specifications, that its gloves now met the EN 374-3 standard. The evidence Medisafe seeks to exclude corroborates this testimony. But the testimony itself is sufficient to show that PCI suffered damages when it updated materials in response to Medisafe's EN 374-3 representations.

Medisafe also argues that PCI's removal of the EN 374-3 compliance items cannot be traced to Medisafe's EN 374-3 representations. Regardless, PCI's decision to add the compliance items is traceable to the representations and is sufficient to show damages. While these particular damages are miniscule in the scope of the parties' business relationship, they are cognizable.[1]

The other elements of PCI's counterclaim are not in dispute. Accordingly, the Court finds that PCI's fraud claim survives summary judgment.

C. **Motion to Exclude Expert Testimony**

PCI has retained William Herber as its damages expert. PCI asserts that Herber's opinion and testimony will support its first two contract causes of action. These causes of action are not now under consideration. While the Court has some doubts about the reliability of Herber's

---

[1] Because the damages element is met, the Court need not address PCI's argument that it also suffered damages when it lost European tenders and a business relationship with an "Indian distributor."

opinions, there is no need to rely on his opinions to decide the motions for summary judgment before the Court. The Court will therefore deny the motion without prejudice and allow Medisafe to renew the motion closer to trial.

## CONCLUSION

Several claims remain in this action. In their Rule 26(f) report, the parties indicated that they were open to alternative dispute resolution. If the parties wish to resolve the remaining claims through ADR, they should inform the Court within fourteen days from the date of this Order. The Court is willing to suggest suitable mediators.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Medisafe's motion for summary judgment [Docket No. 24] is GRANTED. Defendant PCI is liable to Medisafe in the amount of $789,979, due to its breach of contract. Defendant Segat is personally liable for this same amount, due to his personal guarantee.

2. Medisafe's motion for partial summary judgment on PCI's fraud counterclaim [Docket No. 29] is DENIED.

3. Medisafe's motion to exclude expert testimony and opinions [Docket No. 19] is DENIED WITHOUT PREJUDICE.

Dated: March 28, 2016

s/Joan N. Ericksen

JOAN N. ERICKSEN
United States District Judge